1  Gary Underwood Scharff, OSB #88303
   Law Office of Gary Underwood Scharff
2  621 S.W. Morrison Street  Ste 1300
   Portland, OR  97205
3  Tel.: 503-493-4353
   Fax: 503-517-8143
4  Email: gs@scharfflaw.com
   Attorney for Thornburgh Resort Company, LLC,
5  Debtor and debtor in possession.

6

           **UNITED STATES BANKRUPTCY COURT**
7             **FOR THE DISTRICT OF OREGON**

8  In re:                            )  Case No.:  11-31897-tmb11
                                     )
9  **Thornburgh Resort Company, LLC,**  )  **DEBTOR'S OBJECTION TO MOTION**
                                     )  **OF LOYAL LAND, LLC FOR RELIEF**
10        Debtor.                    )  **FROM AUTOMATIC STAY**
                                     )
11                                   )

12       Thornburgh Resort Company, LLC, debtor and debtor in possession in this case

13  ("debtor"), respectfully submits the following objection to the motion  ("Motion") of Loyal

14  Land, LLC ("Loyal") for relief from automatic stay.

15                   **PROCEDURAL BACKGROUND**

16

17       1.      At or about 11:50 am on March 11, 2011 ("Petition Date"), debtor filed its

18  emergency petition in Portland, Oregon, commencing this Chapter 11 case following an

19  unsuccessful effort to resolve consensually a default and foreclosure sale of debtor's real

20  property.

21       2.      Prior to the filing of the bankruptcy petition, Loyal had scheduled a foreclosure

22  sale of certain property of debtor (the "Property" as defined in the Motion) to occur at 1:00 pm

23  on the Petition Date.  Telephonic and facsimile notice of the bankruptcy filing was given by

24  debtor's counsel to the trustee on the trust deed, who confirmed receipt of the notice.  Debtor's

25  counsel later contacted trustee's agent again to confirm there had been no sale.  Trustee's agent

26  stated that the sale had been postponed to April 8, 2011.  Debtor's counsel then contacted

**DEBTOR'S OBJECTION TO MOTION**              Law Office of Gary U. Scharff
**OF LOYAL LAND, LLC FOR RELIEF**            621 S.W. Morrison Street  Ste 1300
**FROM AUTOMATIC STAY** - 1                      Portland, OR  97205
                                                  (503) 493-4353

1    Loyal's counsel, Joe West, reminding him of the automatic stay and debtor's view that

2    rescheduling the sale was an act in violation of the stay.  Mr. West indicated he expected

3    bankruptcy counsel to be retained shortly by Loyal, who would address any issues relating to the

4    automatic stay.  Debtor has not received notice of a cancellation of the rescheduled sale.  To the

5    extent that purported rescheduling of the Property sale had any legal force or effect, it was "an

6    act against property of the estate," undertaken in violation of the automatic stay, Section

7    362(a)(3)  and was void.[1]  By separate motion, debtor intends to seek a court order confirming

8    that any post-petition rescheduling of the pre-petition notice of sale of the Property occurring

9    while the automatic stay is in effect is void and an act in contempt of this court's authority to

10   enforce the automatic stay.

11

12        3.        On March 28, 2011, upon motion of debtor, the court ordered the date for debtor

13   to file its bankruptcy schedules and other missing documents required under Fed.R.B.P.1007

14   extended to April 8, 2011.

15        4.        Loyal filed its Motion on March 22, 2001, eleven days after the Petition Date.

16

17                            **FACTUAL BACKGROUND**

18        5.        Debtor's business is the development and operation of a destination resort on a

19   parcel of land (the "Property," as defined in the Loyal Motion) of approximately1860 acres in

20   Redmond, Oregon (the "resort").  Debtor holds an option for another 160 acres.  The resort

21   began in 2005 as a proposal of Kameron DeLashmutt and his entities, Genesis Development

22

23   _____

24        [1] Section 362(a)(3) provides in pertinent bar that the filing of a bankruptcy petition operates as a stay of
     "any act to obtain possession of property of the estate or of property from the estate or to exercise control over
25   property of the estate."  Rescheduling a sale, if understood by the rescheduling party to have legal force or effect, is
     self-evidently an act purporting to exercise control over property of the estate during the pendency of the bankruptcy
26   case.

**DEBTOR'S OBJECTION TO MOTION
OF LOYAL LAND, LLC FOR RELIEF
FROM AUTOMATIC STAY** - 2

Law Office of Gary U. Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

Group, LLC ("GDG") and Central Resort Company, LLC ("CRC").[2]  The resort includes three golf courses, lots for 1150 homes and overnight units, a hotel, water and utility companies, a real estate sales and marketing company, and substantial other resort improvements.  DeLashmutt Decl. at ¶3.

6.    Debtor's history includes numerous transactions relating to the financing and management of its business, reflected in multiple executory contracts among numerous individuals and their affiliates.  Certain of these contracts relate to obtaining permits for the use of land and for water rights (the "Water Rights") essential to operation of the resort, which is located on range land in the high desert of Central Oregon.  Others of the executory contracts are financing transactions that include funding commitments, financial and performance guarantees and subordination obligations, and provisions for waivers of claims and releases of claims in the course of obtaining financing in different stages.  One of the most important of the finance-related contracts is the "Investment Agreement" ("IA") initially entered into on June 5, 2007, and amended four times thereafter, among Parker Group Investments LLC (PGI[3]; Jeff Parker and Bill Wilt, the PGI principals; debtor; and Kameron DeLashmutt, debtor's principal. An incomplete copy of the IA is included as Exhibit A to the Parker Declaration submitted as part of the Loyal Motion.[4]

---

[2] GDG is wholly owned by Kameron DeLashmutt and owns 90% of CRC, which is the sole owner and member of debtor.  Kameron DeLashmutt's wife, Lisa DeLashmutt, owns the remaining 10% of CRC.

[3] PGI is referred to as 'PG' in the Investment Agreement.

[4] Omitted from the Parker submission are "Exhibit A" to that agreement, as well as Amendment Three. The first page of Exhibit A to the IA, and Amendment Three, are attached to the DeLashmutt Declaration as Exhibit 1 thereto.

**DEBTOR'S OBJECTION TO MOTION OF LOYAL LAND, LLC FOR RELIEF FROM AUTOMATIC STAY** - 3

Law Office of Gary U. Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

7.      The IA was entered into after earlier efforts to fund the initial stages of debtor's resort development had failed to achieve financing goals.  DeLashmutt Decl. at ¶4.  Under the IA, the parties acknowledged that debtor required $30 million of initial funding. Recital B, Section 1.1 and 2.1, and Development Loan funding of approximately $60 million.  Section 2.2. PGI assumed the primary responsibility of locating all that funding. Section 2.3.  PGI was to make its own $10 million contribution (defined in the IA as the "Loan") to be repaid from a large "development loan" it was to arrange (the "Development Loan").  Section 1.1.   PGI assumed the duty to deliver a "Bridge Loan" defined as "$20 million but in no event less than $15 million." IA at Recital B.

8.      To meet its financing obligations under the IA, PGI turned to its preferred lender, Sterling Bank, acting through its subsidiary, Action Mortgage Company ("Sterling"), to deliver the Bridge Loan in its entirety.  Sterling was provided with a copy of the IA and indicated to debtor its desire to be the lender of choice for the entire resort enterprise, including eventually the Development Loan for construction costs of the resort, as well as mortgage lending to home purchasers as the residential phase was sold.  The IA was amended four times as Sterling promised to fund the $20 million Bridge Loan at the outset, then delayed and reduced its funding.  DeLashmutt Decl. at ¶5.

9.      PGI was to be well-compensated under the IA for delivering the Bridge Loan, acquiring ownership of resort lots to be developed on the Property and resold to end users on a retail basis.  Section 3.2(b).

10.      The IA included a budget for the initial stages of the development effort, set forth on Schedule A.  That budget was developed by debtor, reviewed by Sterling and approved by all parties to the IA, including PGI.  Section 1.3.  It included payment of interest on financing,

acquisition costs for Water Rights, salary and key man life insurance for the developer, Mr.

DeLashmutt, payments to professionals working on the land use permitting process, and other

development cost items.  DeLashmutt Decl. at ¶6.  Land use permitting was difficult and

expensive due to mitigation requirements under Oregon law for protecting terrestrial and water

wildlife, as well as continual resistance to the resort at every stage by one wealthy neighbor.

DeLashmutt Decl. at ¶7.

       11.    At no time during the parties' dealings under the IA prior to the material breaches

by PGI detailed below, did debtor exceed the budget line items approved by PGI and Sterling.

Indeed, debtor performed consistently under budget. DeLashmutt Decl. at ¶7.

       12.    Under the IA, in the event that PGI failed to deliver the Bridge Loan, debtor

would not be obligated to make any additional payments other than repayment of the Loan.

Section 3.2(a).  Also, if PGI failed to deliver the Bridge Loan then the Loan principal without

interest could be repaid only if the Development Loan lender allowed such payment from the

Development Loan proceeds, with the interest paid only as lots were sold to end-users at the rate

of $36,353.34 per lot.  If the Development Loan lender did not allow such principal payments,

the sole source of repayment of the Loan would be end-user lot sales as noted.  Sections 3.2(a)

and 1.5.

       13.    The Sterling Loan at issue in the Loyal Motion was obtained by PGI as partial

performance of PGI's duty under the IA to deliver the Bridge Loan.  As a preferred customer of

Sterling Bank, PGI obtained an initial promise from the bank to loan $20 million, which the bank

later reduced to $15 million, which promise matured into a binding commitment in mid-October

2007 subject to one condition only  -- delivery of an October 2004  Phase 1 Environmental

Report -- which delivery occurred promptly.  DeLashmutt Decl. at ¶7.  At funding in mid-

**DEBTOR'S OBJECTION TO MOTION**
**OF LOYAL LAND, LLC FOR RELIEF**
**FROM AUTOMATIC STAY** - 5

1    November 2007, however, Sterling delivered only approximately $10,956,000, provided to PGI

2    as Sterling's borrower.  PGI in turn delivered those funds to debtor as a "pass-through loan"

3    pursuant to PGI's Bridge Loan duty under the IA.  The bank orally committed to delivering the

4    remaining $4 million upon Final Master Plan ("FMP") approval.  Despite approval of FMP on

5    October 6, 2008, Sterling never completed that funding, leaving debtor underfunded pursuant to

6    the $15 million budget Sterling had earlier reviewed and accepted.  DeLashmutt Decl. at ¶9.

7

8         14.    In reliance on Sterling's promise to complete its $15 million funding

9    commitment, and on PGI's promise of performance of the IA, including funding of the Bridge

10   Loan to the extent of the $4,044,000 remaining due, debtor granted Sterling a trust deed in mid-

11   November 2007.  DeLashmutt Decl. at ¶9.

12        15.    PGI remained obligated after November 2007 to fund the $4 million shortfall to

13   meet its Bridge Loan obligation.  PGI assured debtor the $4 million would be forthcoming.

14   DeLashmutt Decl. at ¶10.  Although PGI advanced additional sums in late 2007 and early 2008,

15   it never performed its Bridge Loan obligation, leaving debtor and the resort budget underfunded

16   by several million dollars.  One particularly serious result of this lack of funding was debtor's

17   inability to fund the budgeted $438,000 needed to purchase 175 acres of the Water Rights in

18   April 2008 which debtor was contractually obligated to do.  Without the purchase of those 175

19   acres the contract to purchase further water would be terminated and debtor would lose all rights

20   to and in the Water Rights.  Without the Water Rights the resort development could not proceed.

21   DeLashmutt Decl. at ¶10.

22

23        16.    PGI also had obligations under the IA to subordinate its debt, IA at Section 4.2,

24   and guarantee other debt of debtor in order to open funding opportunities elsewhere for debtor.

25   Section 4.3.  PGI refused to honor those obligations, as well.  DeLashmutt Decl. at ¶11.  These

26

**DEBTOR'S OBJECTION TO MOTION
OF LOYAL LAND, LLC FOR RELIEF
FROM AUTOMATIC STAY** - 6

1    and other material breaches of the IA by PGI, and by Sterling of its loan commitments to the

2    debtor's resort, left debtor financially disabled in late 2007 and early 2008. DeLashmutt Decl. at

3    ¶11.

4

5        17.    As a result of the IA breaches by PGI, debtor served notice on PGI in mid-2008

6    that PGI was in default under the IA.  PGI rejected that notice, refused to cure its defaults and

7    declined to make payments on the Sterling Loan, putting debtor's collateral on that loan, the

8    Property, at risk should Sterling elect to pursue a default and notice of sale of foreclosure of the

9    trust deed. DeLashmutt Decl. at ¶12.

10       18.    PGI, in January 2010, registered a new entity, Central Oregon Investments

11   Holdings, LLC ("COIH") with the Oregon Secretary of State.  Parker caused COIH to enter into

12   a contract with Sterling to purchase the Sterling Note. DeLashmutt Decl. at ¶13.  Mr.

13   DeLashmutt understood Jeff Parker to be the dominant decision-maker for COIH, based upon

14   statements to him from persons who dealt with that entity.  At the same time that Sterling was

15   negotiating with him to have the debtor buy the Sterling Loan for approximately $9.5 million,

16   Mr. DeLashmutt learned that the bank entered into an agreement with COIH at a significantly

17   lower price. *Id.*  As shown in Loyal's submissions in its Motion, COIH acquired the Sterling

18   Loan on March 2, 2011, and transferred it on the same day to Loyal.  The website of the Oregon

19   Secretary of State reports that COIH failed to pay its annual renewal fee in January 2011 and was

20   administratively dissolved on March 11, 2011, nine days after it acquired and resold the Sterling

21   Loan documents.

22       19.    The Loyal Motion is a serious threat to the bankruptcy estate.  If it is granted,

23   debtor may lose access to the Property and the ability to complete the resort after more than 6

24   years of intense effort and significant contributions of creditor money.  DeLashmutt Decl. at ¶14.

25

26

**DEBTOR'S OBJECTION TO MOTION
OF LOYAL LAND, LLC FOR RELIEF
FROM AUTOMATIC STAY** - 7

1   Loyal and its apparent partners in the loan acquisition, PGI and COIH, would seek to benefit

2   from debtor's investment if it is determined that the land use entitlements run with the land, as

3   debtor believes may be the case.  Loyal's foreclosure would thus represent a complete loss to all

4   creditors except Loyal and PGI, who in turn may enjoy an unearned and inequitable windfall.

5   Debtor's land use counsel estimates at this time that somewhere under $300,000 is needed to

6   complete the land use permitting component of the development of the Resort, after an

7   expenditure in that category to date of over $8.4 million. DeLashmutt Decl. at ¶15.

8

9                                    **OBJECTION**

10      20.     Relying on 11 USC Section 362(d)(1) and (2), Loyal contends it is entitled to

11  relief from the automatic stay in that:

12      a.      It has an interest in the Property.

13      b.      Cause exists for the relief requested in that Loyal is entitled to payments on a loan

14  obligation of PGI, which payments have not been made.

15      c.      The debtor has no equity in the Property.

16      d.      The Property is not "necessary to an effective reorganization" because no

17  effective reorganization can occur due to debtor's lack of funds to proceed with the

18  reorganization, and debtor's inability to meet an August 16, 2011 deadline to respond to a

19  remand from the Oregon Land Use Board of Appeals ("LUBA").

20      21.     Loyal argues in the alternative that the case should be dismissed under Section

21  1112(b) for lack of good faith in its filing.  Both contentions are without merit.

22      22.     Debtor objects to the Motion on the grounds that: (a) the cited elements of Section

23  362(d) have not been met; and (b) there was no lack of good faith in the filing of this case.

24

25

26

**DEBTOR'S OBJECTION TO MOTION
OF LOYAL LAND, LLC FOR RELIEF
FROM AUTOMATIC STAY** - 8

Law Office of Gary U. Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

23.    At this preliminary hearing stage of the Motion, debtor is still developing its evidence as to the circumstances of the competing obligations and rights relative to the Property of PGI, debtor, Sterling, COIH and Loyal.  However, at this stage, Loyal's own materials filed in support of the Motion demonstrate the incompleteness of the evidence of Loyal's claim to hold an interest in the Property.  Accordingly, unless and until Loyal can conclusively establish its claim of interest, the Motion must be denied.

**Loyal has not shown it holds a valid and legally effective interest in the Property.**

24.    The Motion contends that in November 2007 the Sterling Loan was funded in the amount of approximately $10,956,000 to PGI, and that on March 2, 2011, Loyal duly acquired by an assumption and assignment agreement all of Sterling's right, title and interest in that loan. Loyal's documents show that that assignment occurred in two steps on the same day, March 2, 2011.  First, COIH, an entity which debtor expects to prove was controlled by Jeffrey Parker, the PGI principal, acquired the loan from Sterling.  Loyal then allegedly acquired from COIH on that same day all right, title and interest in the Sterling Loan.  *See*, Exhibits D and E to the Parker Declaration.

25.    Pages 4-5 of Exhibit E to the Parker declaration set forth 23 items detailing the substance of the transferred Sterling Loan interests.  That list of identified documents demonstrates the inadequacy of Loyal's showing of an interest in the Property.  The following documents contain qualifications to the rights and obligations of Sterling in the process of assumption and assignment to COIH and Loyal.  Until those qualifications, highlighted below, are disclosed by providing copies of these "Loan Documents," the full extent of Loyal's rights in the Property, and the limitations on those rights, cannot be definitively known.

**DEBTOR'S OBJECTION TO MOTION
OF LOYAL LAND, LLC FOR RELIEF
FROM AUTOMATIC STAY** - 9

Law Office of Gary U. Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

1         a.     Promissory Note, dated November 19, 2007, executed by Parker Group

2    Investments, LLC, … in favor of Sterling Savings Bank … in the original principal amount of

3    $10,956,000.00 *together with an Allonge in the form attached as Exhibit A to that certain Note*

4    *Purchase and Sale Agreement dated as of September 15, 2010 between CENTRAL OREGON*

5    *INVESTMENT HOLDINGS, LLC, as Oregon Limited Liability company and the Bank, duly*

6    *executed and indorsed by the Seller.*

7

8         b.     Sterling's Assignment of Trust Deed to COIH, and their Assignment and

9    Assumption Agreement (at pages 1 and 3 of Exhibit D to the Parker declaration) are made

10   "without recourse, representation or warranty of any kind *except as expressly set forth in Section*

11   *6 of that certain Fourth Amended Note Purchase and Sale Agreement dated as of March 2, 2011,*

12   *between COIH and the Bank"*.  <u>*Id*</u>.  The Loyal Motion provides no copies of the highlighted

13   documents, which may limit the rights assigned to COIH, and thereafter to Loyal.

14

15        c.     COIH's Assignment of Trust Deed to Loyal and its Assignment and Assumption

16   Agreement (at pages 1 and 2 of Exhibit E to the Parker declaration) are made "without recourse,

17   representation or warranty of any kind *except as expressly set forth in Section 5 (or 6) of that*

18   *certain Note Purchase and Sale Agreement dated as of March 2, 2011, between COIH and*

19   *Loyal"*.  Again, the Loyal Motion provides no copies of the highlighted documents, which may

20   limit the rights assigned by COIH to Loyal.

21        d.     The Line of Credit Instrument dated as of November 19, 2007, executed by

22   Parker Group Investments, LLC, an Oregon limited liability company, in favor of the Bank, as

23   Beneficiary, and *recorded on December 5, 2007, under Instrument/File No. 2007-62677*, of the

24   Official Records of Deschutes County, State of Oregon.  Loyal has provided two (2) copies of

25   the Line of Credit Instrument Deed of Trust, recorded on November 26, 2007 under

26

**DEBTOR'S OBJECTION TO MOTION
OF LOYAL LAND, LLC FOR RELIEF
FROM AUTOMATIC STAY** - 10

1  Instrument/File No. 2007-61125 of the Official Records of Deschutes County (see the two page

2  1s of two identical Exhibit Cs to the Parker Declaration).  The Assignments of Deed of Trust

3  between Bank and COIH (Exhibit D page 1) and COIH and Loyal (Exhibit E page 1) both refer

4  to the Line of Credit Instrument as shown on the Exhibits C to the Parker Declaration, and add,

5  "*as re-recorded on December 5, 2007 under Instrument/File No. 2007-62677.*"  The Loyal

6  Motion does not provide a copy of this later, re-recorded Letter of Credit Instrument.  A party or

7  court reviewing the documents cannot determine whether, and if so why and in what respect, the

8  later recordation may differ from or release the Letter of Credit Instrument cited in the Motion,

9

10  and why the later document was recorded.  The confusion as to these documents is compounded

11  by the fact that the Bank-COIH and COIH-Loyal Assignment and Assumption Agreements both

12  refer to the recorded Letter of Credit Instrument as "re-recorded on December 5, 2007, under

13  "Instrument/File No. 2007-67677" rather than No. 2007-62677.  (Exh. D page 3, and Exh. E

14  page 2, to the Parker declaration).

15
        e.      *Lot/Land Agreement dated November 19, 2007, between Borrower and Bank.*

16  This document is referred to in the Letter of Credit Instrument (at pages 7 and 7, respectively, of

17  the two Exhibit Cs to the Parker declaration) as follows:  "An exhibit, titled LOT/LAND LOAN

18  AGREEMENT, is attached to this Deed of Trust and by this reference is made a part of this

19  Deed of Trust just as if all the provisions, terms and conditions of the Exhibit had been fully set

20  forth in this Deed of Trust."  The terms of this Lot/Land Loan Agreement appear to be intended

21  as an integral part of the Letter of Credit Instrument.  Loyal's Motion provides no copies, leaving

22  a reviewer unable to determine whether significant components of Sterling's rights in the loan

23  materials have been altered.

24

25

26


**DEBTOR'S OBJECTION TO MOTION
OF LOYAL LAND, LLC FOR RELIEF
FROM AUTOMATIC STAY** - 11

f.      In addition, the following documents, which are missing from the Loyal Motion, have names suggesting various possible shifts in rights and interests that cannot be determined without a review of the documents:

- Item 4 on Exhibit E, p. 4:  Limited Liability Company Resolution To Borrow/Grant Collateral dated 11/19/2007;

- Item 12 on Exhibit E, p. 4:  Corporate Resolution to Grant Collateral/Guarantee dated 11/19/2007, executed by Borrower (Borrower is an LLC);

- Items 7-10 on Exhibit E, p. 4: these subordination agreements bear different dates and different obligors (why were these done on different dates, with one done by an entity which is not a party to the trust deed?).  These suggest a possible lack of clarity in the relationships among parties holding different interests and relationships to this credit;

- Items 19-22 on Exhibit E, p. 5:  These are four "Change In Terms Agreements" executed by Borrower on November 13, 2008 (one year after the credit was advanced), and January 2, April 1, and April 20, 2009.  Were debtor's rights compromised by altered terms that put debtor's collateral at greater risk?

- Item 23 on Exhibit E, p. 5: (Title Insurance Policy, dated November 26, 2007), this insurance policy was issued more than a week before the re-recording of the Line of Credit Instrument.  Significance?

26.     The Property is essential to debtor's reorganization, in that the resort cannot be reorganized apart from the land where it is situated.  Loyal contends, however, that no "effective" reorganization can occur under debtor's ownership of the Property.  Loyal contends that debtor cannot obtain DIP financing or major construction and project financing.  To the

**DEBTOR'S OBJECTION TO MOTION
OF LOYAL LAND, LLC FOR RELIEF
FROM AUTOMATIC STAY** - 12

contrary, debtor will produce evidence at the final hearing on this matter that two significant

financing packages are nearing completion, allowing a cash infusion of an amount well in excess

of Parker's estimate of $1.5 million as the Property value in its current condition.  This financing

would arrive through collateralizing assets of debtor's parent entities and other affiliates.

### Property Development Issues

27.     Loyal further contends that given debtor's limited resources at this time, debtor is

incapable of performing on a land use remand from LUBA, which calls for a required

submission to Deschutes County by August 16, 2011.  Without waiver of the attorney-client

privilege, debtor will provide evidence at the final hearing confirming the comments of Peter

Livingston, debtor's pre-filing land use attorney, who has considered this matter and explained

what is required to meet the August 16, 2011 deadline.[5]  He states that the August 16, 2011

submission consists of a single letter to the County accepting the remand, requiring perhaps two

hours of attorney time.  That submission will commence a process that under statute is

contemplated to require 90 days to complete, subject to an extension for a "reasonable time"

which Mr. Livingston believes could be as long as 6-9 months.  In short, Loyal is mistaken as to

the supposed urgency of the August 16, 2011 deadline and the potential loss of entitlements if

debtor is unable to obtain substantial development financing funds between April and August

2011.

28.     Also relevant to future development viability of the resort under debtor's watch

are Mr. Livingston's expectations of future costs of professionals, fees, etc. needed to complete

the permitting at this stage.  Mr. Livingston, involved throughout debtor's planning and

---

[5] Debtor has informally shared, through conversations and emails between counsel, Mr. Livingston's comments, emailed to debtor, with Loyal prior to the filing of this objection.

**DEBTOR'S OBJECTION TO MOTION OF LOYAL LAND, LLC FOR RELIEF FROM AUTOMATIC STAY** - 13

Law Office of Gary U. Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353

1  permitting process, has recently estimated future costs for the next stage to be less than

2  $300,000.  This is to be compared to debtor's costs for planning and permitting on the resort

3  from inception of the resort through March 31, 2009, of $8,493,164.

4          WHEREFORE, debtor respectfully requests that the Loyal Motion be denied.

5          DATED this 4th day of April, 2011.

6

7                          /s/ Gary Underwood Scharff
                           Attorney for Thornburgh Resort Company, LLC,
8                          debtor and debtor in possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**DEBTOR'S OBJECTION TO MOTION**
**OF LOYAL LAND, LLC FOR RELIEF**
**FROM AUTOMATIC STAY** - 14

Law Office of Gary U. Scharff
621 S.W. Morrison Street  Ste 1300
Portland, OR  97205
(503) 493-4353